

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

---

CP:SLD/MJR
F. #2003R01382

*One Pierrepont Plaza*
*Brooklyn, New York  11201*

*Mailing Address:*  147 Pierrepont Street
*Brooklyn, New York  11201*

January 9, 2006

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

      Re:  United States v. Michael Adams, et al.
           Criminal Docket No. 03-1368(ARR)

Dear Judge Ross:

      The government writes in support of the Probation Department's finding that a two-point enhancement for "abuse of a position of trust" is warranted against those defendants who abused their positions at John F. Kennedy International Airport ("JFK Airport") to import bulk shipments of drugs into the United States. See United States Sentencing Guideline ("U.S.S.G.") § 3B1.3.  The defendants in this case have objected to the proposed enhancement, arguing, among other things, that their menial positions as baggage handlers and warehouse workers at the airport were not ones of "public trust."  The defendants' position is inconsistent with the facts.

      As demonstrated at the hearing before the Court on December 16, 2005, and further detailed below, as part of their positions, the defendants were entrusted with a security clearance that allowed them unfettered access to sensitive areas at JFK Airport so that they could do the jobs that they had been hired to do.  This access afforded the defendants substantial discretion to travel in and around the airport with little or no supervision.  Clearly, the freedom to roam secured and sensitive areas throughout the airport is a significant hallmark of the public trust that had been bestowed upon these defendants.  The defendants' attempts at belittling the significance of their positions by pointing to the menial nature of the work is misplaced and unavailing.

2

**A.    THE DECEMBER 16, 2005 EVIDENTIARY HEARING**

On December 16, 2005, the Court held an evidentiary hearing in order to resolve the preliminary issue of whether the defendants held a position of trust.  Central to the Court's inquiry was "whether the Port Authority and Customs granted [the defendants] extensive discretion to travel around and conduct the tasks required by their employment in certain restricted areas at JFK Airport." United States v. Adams, 03-CR-1368(ARR), Opinion and Order, December 2, 2005, p. 3.  As demonstrated at the hearing, that is exactly what the agencies did.

At the hearing, the government called two witnesses.  First, the government called Special Agent Fred Wagner, Department of Homeland Security, Immigration and Customs Enforcement ("Customs").  Agent Wagner described the general processing of international passengers, baggage, cargo and mail at JFK Airport, as well as the restrictive nature of those areas given their sensitivity to the mission of Customs.  As a member of the group responsible for granting access to these areas, the Customs Hologram Enforcement Team (the "CHASE Team"), Agent Wagner further testified about the application process and the issuance of a Customs "seal" or "hologram" that grants an employee access to these restricted Customs areas.  Finally, Agent Wagner testified about Customs' ability to monitor the activities of airport employees throughout JFK Airport.

Second, the government called Dennis McCormick, the manager of airport security at JFK Airport for the Port Authority of New York and New Jersey (the "Port Authority").  Mr. McCormick described the overall security measures at the airport, including the Secured Identification Display Area badges ("SIDA"), which control access to restricted areas at the airport.  Mr. McCormick testified how the Customs "seal" is used in conjunction with the SIDA badge to restrict access to JFK Airport.  Mr. McCormick also discussed JFK Airport operations generally.

**1.    JOHN F. KENNEDY INTERNATIONAL AIRPORT**

JFK Airport, a major international gateway into the United States, is immense in size and scope.  The airport is approximately 5,000 acres in size employing approximately 45,000 people. (T. 54; 19-21).[1]  The nine active passenger terminals at

---

[1] References to the trial transcript, which contains the defendant's plea proceedings, are made by "Tr. __:__", pages precede line numbers and are separated by a colon.

3

the airport contain approximately 90 airplane gates and are used by about 100 international and domestic air carriers to ferry over 41 million people into, out of and throughout the United States each year. (T. 54:22-56:4).

Every day, approximately 350 international flights (127,750 a year) arrive at and depart from JFK Airport. (T. 55:8-13). On a yearly basis, JFK Airport processes approximately 20 million international passengers and their luggage, estimated to be two pieces for each passenger. (T. 56:6-15). In addition to servicing passengers and their luggage, JFK Airport also has significant cargo and mail processing capacity. Each year, JFK Airport handles 1.8 million tons of cargo, seventy-five percent of which is international (T. 55:14-20) and over 95,000 tons of mail (T. 55:21-24).

Critical to the successful operation of the airport are the approximately 32,000 employees who have been given special clearance to access secured areas of JFK Airport and process the enormous amount of passengers, luggage, mail and cargo. (T. 76:8-9).

2. **POLICING JOHN F. KENNEDY INTERNATIONAL AIRPORT**

Although JFK Airport is an immense facility, it is policed by a very small contingent of law enforcement officers. There are approximately 300 Port Authority Police assigned to JFK Airport, but during a typical shift, only 60 or so officers are working at any one time. (T. 56:16-57:4). Among other things, these officers are responsible for conducting "traffic control, enforcing the New York City state criminal code, as well as vehicle traffic laws" (T. 57:7-9), as well as being first responders to any airport disaster. (T. 57:10-15).

It is the job of Customs' Internal Conspiracy Group to investigate violations of federal law involving corrupt airport employees. (T. 17:7-7). To be sure, policing the activities of the 32,000 employees who hold SIDA badges is a daunting one, especially when spread out over a sprawling landscape such as JFK Airport. However, the job is made even more difficult by the limited resources available. The Internal Conspiracy Group is comprised of only 8 to 10 agents. (T. 21:8-10; 29:16). While there are some efforts taken to monitor the activities of these employees, it is not necessarily fruitful. Surveillance, for example, is conducted for only brief amounts of time in "regular" cars, as opposed to airport vehicles, that are easily spotted. (T. 20:10-21:8; 41:20-43:6). Entry into secured areas is monitored through electronic gateways that record ingress and

egress.  Those records, however, are very inaccurate (T. 18:18-20:9; 43:7-45:3) and are only reviewed when Customs has information of criminal activity (T. 45:24-46:17).  Cameras are in place in several locations at the airport, but are unable to observe the entire location and are often dismantled or contravened. (T. 18:3-12).

Accordingly, the Customs agents focus their attention on those employees against whom they have received information of criminal activity.  The agents also rely on the random enforcement actions of Customs and Border Protection ("CBP") officers who spot check as much as 30% of arriving international flights for contraband. (T. 50:14-51:7). However, the likelihood that CBP would observe the criminal activity of an airport employee is slim.  Indeed, the officers meet the plane at the location it is expected to be offloaded, making their presence known before any employee has a chance to approach the plane. (T. 49:23-50:11).

### 3. THE SIDA PROGRAM

In an effort to address the limited supervision of employees at JFK Airport, the Port Authority and Customs rely on the integrity of the SIDA program.  Under the Port Authority's SIDA program, access to sensitive areas of the airport is controlled by a system of electronically controlled entrances, which may be opened using Port Authority issued "swipe" cards, in combination with a "PIN" or personal identification number.  (T. 59:5-10).  There are over 1,200 points of entry at JFK Airport which are controlled by this swipe card system. (T. 59:5-7). However, a SIDA card need not be swiped to exit the JFK Airport tarmac (T. 59:11-12), and none of the tarmac exits are manned or monitored by security guards (T. 72:1-6).

The SIDA badges are also color-coded, as a visual cue, reflecting the type of access afforded to the badge holder.  A badge with a yellow background indicates that the employee is permitted to enter "sterile" areas of the terminals, for example, baggage rooms or cargo warehouses.  (T. 58:16-19).  An employee bearing a badge with a red background has permission to go on the airport tarmac or "aeronautical operation area" ("AOA"). (T. 58:19-20).  Once an employee gains access to the tarmac using his red SIDA badge, that employee has unrestricted and unescorted access to the entire JFK tarmac, an immense area, and can come and go from the tarmac without restriction.  (T. 59:2-4; 60:5-8). For example, there is no restriction preventing employees with a red SIDA badge from freely coming and going between the tarmac area around the passenger terminals and the cargo buildings,

5

which are over 2.5 miles away. (T. 70:22-71:8). Once an individual is on the JFK tarmac, they are not under any sort of escort or active monitoring. In fact, many employees who are granted SIDA access are also granted permission to escort up to five non-SIDA badge carrying individuals in the restricted areas. (T. 66:4-24).

SIDA badges are issued by the Port Authority, which has a specific process by which it issues the badges. (Government Exhibit 2). The badge application is first made through the employee's company. As an initial matter, a company needs to obtain approval before it can even seek SIDA badges for its employees. (T. 62:5-11). Each company which operates at JFK Airport has employees designated as "issuing officers" who coordinate the application and issuing process for their company. (T. 62:17-63:13). Before becoming an issuing officer, an individual must go through a Port Authority specialized training class, where they learn about the regulations and application process. (T. 62:11-15).

Once an issuing officer is appointed, he or she takes applications from other employees for SIDA badges. (T. 62:17-63:13). After the issuing officer reviews the application, it is sent to the Port Authority for further review and processing. (Id.). The employee seeking the badge then goes to the Port Authority, where their fingerprints are taken and sent to the FBI for a criminal database check. (Id.). The Port Authority also requires that an applicant provide two pieces of government issued identification at the time the application is processed. (Id.).

If the FBI database check determines that the SIDA badge applicant has no criminal background, then the applicant is sent to the SIDA training program. (T. 63:1-8). This program consists of a four-hour long class where the applicants are trained as to the roles, responsibilities and regulations that relate to their use of the SIDA badge at JFK Airport. (T. 67:20-68:10). An examination is given at the end of the class. (Id.). Those who pass the class receive a certificate and are issued a SIDA badge, while those who fail do not receive a badge. (Id.; T. 69:19-21).

In addition to receiving training concerning the proper use of the SIDA badge, employees are instructed that they should "challenge" anyone in a restricted area who is not visibly wearing their SIDA badge. (T. 68:16-69:3). Individuals who successfully challenge unauthorized individuals in secured areas are given a cash award, while those who do not attempt a

challenge receive a "breach of rules." (T. 69:11-13). Those who receive a breach of rules are mandated to go to a refresher course. (T. 69:13-17). SIDA badge holders who receive three breach of rules in an eighteen-month period lose their SIDA badge privileges. (T. 69:18).

In addition to the SIDA badge, an airport employee who needs access to areas of the airport under the jurisdiction of Customs and Border Protection also needs a "Customs Seal" or hologram, which is affixed to the SIDA badge. (T. 61:3-16). The seal is affixed to the SIDA badge by agreement between Customs and Border Protection and the Port Authority, as an alternative to requiring employees to carry two identification cards. (Id.).

The special access afforded by SIDA cards bearing the Customs Seal ensures that only authorized personnel are in areas that need to be secured for customs and border purposes. For example, the pathways between incoming international flights and the customs inspection areas, which are referred to as "sterile" corridors, are restricted so that there is no contact between incoming international passengers and domestic freight or people. (T. 8:19-9:6). These areas are secured with doors and alarms that require a swipe card to enter or exit. (T. 9:11-16). Similarly, special permission is needed from CBP for airline employees to be in the areas where international cargo and baggage is unloaded and handled before they are subject to a border search. (T. 9:17-11:23).

The Customs Seal, when affixed to the SIDA badge, demonstrates the level of customs clearance, or "zone" afforded to a JFK employee. Once a certain zone clearance is granted, a color coded hologram is affixed to the Port Authority SIDA badge. (T. 16:11-17). In order to obtain customs clearance, an employee at JFK Airport must fill out an application which is reviewed by ICE's CHASE Team. (T. 12:11-14, T. 16:23-17:1). The CHASE Team reviews the application and uses the information provided by the employee to determine if the employee should be granted customs clearance. (T. 12:12-14).

The customs-secured areas at JFK areas are designated as three different zones. (T. 14:14-15). Zone 1 clearance permits the bearer to enter incoming international flights, the attached jetway and sterile corridor leading to the customs inspection area. (T. 15:8-13). A Zone 1 clearance would typically be granted to customs representatives and other personnel who greet passengers coming off arriving international flights. (T. 15:14-19). Zone 2 includes the inside of an international flight once it disembarks, the cargo areas

underneath the plane, the belt area where international baggage is handled and the cargo warehouses where international cargo is handled. (T. 15:20-16:7). Individuals who unload incoming international flights are among those who would have Zone 2 clearance. (T. 16:4-5). Zone 3 clearance permits access to both Zones 1 and 2 and is given to government employees. (T. 16:8-10). There is no alarm or other restriction preventing an individual from passing from one zone to another, other than the swipe feature. (T. 23:13-20).

**B. ARGUMENT**

The security clearance provided by Port Authority and Customs through the SIDA program imbues an employee with the authority to enter, leave and roam about restricted areas of JFK Airport at their own discretion and with little or no supervision.[2] United States v. Castagnet, 936 F.2d 57, 61-62 (2d Cir. 1991) quoting United States v. Hill, 915 F.2d 502, 506 (9th Cir. 1990)("[T]he primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult to detect wrong.") This is not a design based upon governmental inertia, but rather operational necessity -- work schedules change, planes are rerouted, containers need to be moved throughout the facility, as does luggage, mail and cargo. There is no feasible way to conduct the smooth operation of such a massive international gateway like JFK Airport without permitting employees to do their jobs freely. This discretion, however, cannot be without oversight. Indeed, the employees who operate in these areas are processing international passengers, luggage, mail and cargo before it is subjected to any form of federal inspection. In this day and age, the possibilities that may well arise from the exploitation of such a position, as demonstrated by the evidence in this case, are sobering.

While the sensitivity of their jobs requires oversight, the nature of their work undermines it. Indeed, there is nothing suspicious about a baggage handler moving luggage or a food service person removing bags of ice from a plane. Unless each and every employee is challenged and every article in their possession is inspected for contraband could anyone be secure that an employee was only doing his or her job. This, however, would be logistically impossible and, were it ever attempted,

---

[2] Indeed, once granted, an employee has access to JFK Airport any day and at any time, without regard to their work schedule. (T. 95:9-13).

8

would cause the business of the airport to come to a grinding halt. Castagnet, 936 F.2d at 62, quoting Hill, 915 F.2d at 506 ("If one party is able to take criminal advantage of the relationship without fear of ready or quick notice by the second party, the second party has clearly placed a level of trust in the first.")

Indeed, the airport operates twenty-four hours a day, seven days a week, three-hundred and sixty five days a year over 5,000 acres. On a yearly basis, the airport handles tens of thousands of flights, millions of passengers and luggage, along with tons of cargo and mail. There are simply not enough governmental personnel to accomplish the herculean feat of monitoring the activities of 35,000 employees spread out over this vast landscape. Id. ("A second indicium of freedom to commit a difficult-to-detect wrong is the ease with which the [defendant's] activities can be observed . . . If one has placed a defendant in a position to commit a crime and leave the area before the crime will be discovered, the defendant will generally be in a position of trust.")

In an attempt to strike a delicate balance between the sensitivity of the work and the reality of the environment in which the work is conducted, the Port Authority and Customs has enlisted the aid of the SIDA program. Realizing that they cannot be everywhere to monitor everything, the program is based upon a fundamental tenet: trust the employee to do their job, and nothing else.

This trust is not idly doled out, but rather deliberated upon following an application process that is engineered to identify trustworthy individuals -- those who have legitimate business at the airport, have not committed a crime or suffer some other form of disqualifying characteristic (T. 13:19-14:2), pass a fingerprint background check (T. 62:17-24) and complete a rigorous training program focusing on the security and responsibilities of the clearance for which they have applied (T. 67:25-68:10). Indeed, at an airport of such a massive scale in both size and function, policing the activities of the employees is an overwhelming task. Therefore, the Port Authority and Customs has to trust the employees that they are there to do their jobs and not to exploit them. Clearly, these employees are subject to some monitoring, but the level of supervision they receive, when compared to be the sensitive areas that they are entitled to be in and the jobs they are supposed to be doing, is minimal at best. This is not evidence of governmental ineptitude, but trust.

9

The fact that employees at JFK Airport are monitored is not pernicious to the government's position or conclusive to the Court's inquiry. The salient inquiry explores the level of that monitoring in order to identify the existence of any trust imbued in an employee. In the present matter, the level of supervision of these employees is slight for one simple and inescapable reason: the authorizing agencies have placed their trust in these employees.

**C.   CONCLUSION**

Based upon the foregoing, the government has established by a preponderance of the evidence that the defendants enjoyed a position of trust at JFK Airport.

Respectfully submitted,

ROSLYNN R. MAUSKOPF
United States Attorney

By:   /s/
Steven L. D'Alessandro
Assistant U.S. Attorney
(718) 254-6200

By:   /s/
Michael J. Ramos
Assistant U.S. Attorney
(718) 254-6532

cc:  All counsel (by telecopier)
     Jaime Turton, U.S. Probation Officer
     Clerk of the Court (ARR) (via ECF)